UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
JEFFUS LEFTENANT,

                       Petitioner,                       **REPORT AND
RECOMMENDATION**

          -against-                          CV 07-3696 (JS)(ARL)

JOSEPH SMITH, SUPERINTENDENT,

                       Respondent.
------------------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

       Before the court, on referral from District Judge Seybert, is the request of the *pro se*

petitioner, Jeffus Leftenant ("Leftenant"), for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254, challenging his 1999 conviction entered in the New York State Supreme Court, Suffolk

County.  On December 8, 1999, as modified on December 14, 1999, the state court entered a

judgment of conviction following a jury verdict that found the petitioner guilty of two counts of

murder in the second degree, attempted murder in the second degree, and robbery in the first

degree.[1]  Leftenant was sentenced to an indeterminate term of imprisonment of twenty-five years

to life for his conviction on the two second degree murder counts, to be served concurrently, and

to a determinate sentence of twenty-five years for his conviction of attempted murder and

robbery, to be served concurrently but consecutive to his indeterminate sentence of twenty-five

years to life.  Leftenant is currently incarcerated at Shawangunk Correctional Facility in Wallkill,

New York.

       On August 29, 2007, Leftenant filed his writ of habeas corpus alleging three grounds for

---

[1]The December 14, 1999 sentencing clarified the record with respect to Leftenant's
sentence on counts three and four of the indictment.

relief: (1) that his right to confrontation was violated; (2) that he was denied the effective assistance of counsel; and (3) that he did not receive a fair trial. *See* Pet. and Pet.'s Mem. of Law. The respondent argues that the petition should be dismissed because Leftenant's claims are procedurally barred and/or without merit. *See* Resp.'s Mem. of Law at 5-17. For the reasons that are set forth below, the undersigned recommends that the petitioner's application for a writ of habeas corpus be denied.

## FACTUAL BACKGROUND

The facts have been gleaned from the testimony in the record of the petitioner's trial. On September 26, 1997, three armed men robbed an armored truck transporting approximately $300,000 in cash deposits. The robbery resulted in the fatal shooting of the armored truck driver, Andre Herring ("Herring"), and the wounding of his partner, Joseph Micieli ("Micieli"). The prosecution claimed that Leftenant, his cousin Richard Blie ("Blie"), and Jamal Starks, planned and orchestrated the robbery. At trial, the prosecution presented the testimony of Micieli, Micieli's son, and several Suffolk County police officers, who described the crime. The prosecution also called Carmel Kelly, the petitioner's estranged girlfriend, and several forensics specialists, who provided circumstantial evidence regarding the crime. Finally, the prosecution presented the testimony of several automobile salesmen who testified that Leftenant and his family had purchased several cars after of the crime.

## A.    Events Leading up to the Robbery

Patriot Security is an armored car company that transports deposits for retailers in the Long Island/Downstate New York region. Tr. at 175. The company is based in Westhampton Beach, New York and owns a fleet of vehicles ranging from full-fledged armored trucks to small,

unmarked vans.  *Id.*  Each truck holds two Patriot employees: a driver, who operates the vehicle and a "jumper," who picks up deposits from the retailer.  Tr. at 183, 607-08.  Patriot employees are armed at all times and are required to wear bulletproof vests in the course of their duties.  Tr. at 181, 188.

Route 26 is one of the Patriot routes.  Leftenant's cousin, Richard Blie, had been employed by Patriot and was familiar with the armored van's route.  Tr. at 180-85.  The Route 26 van starts at 9:30 each morning in Westhampton Beach and services all of Patriot's Brooklyn customers.  Tr. at 175, 603.  Before returning home, the van stops at the United States Postal Office in Melville, New York.  Tr. at 603.  The van then returns to Patriot's warehouse in Westhampton Beach, where the deposits are counted and secured.  Tr. at 176, 604-05.  On Friday evenings, the Route 26 van makes an additional stop at the Tanger Outlet Center in Riverhead, New York.  Tr.  at 176.  The Tanger deposit, which is typically large, is immediately brought to the night deposit drop of the local Suffolk County National Bank.  Tr. at 176-77.  The van usually arrives at the bank at 11:30 p.m.  Tr. at 180.  After the Tanger drop is made, the truck returns to Westhampton Beach with the rest of the deposits.  *Id.*

On Friday, September 26, 1997, Patriot employees Micieli and Herring, were assigned to the armored van servicing Route 26.  Tr. at 605-06.  Micieli drove the van during the day and Herring worked as the jumper.  Tr. at 610.  Herring and Micieli followed the normal route and arrived at the Melville Post Office at approximately 9:45 p.m.  Tr. at 609.  Micieli removed his bulletproof vest.  Tr. at 611.  After the pickup, the pair grabbed dinner at a local Burger King and switched roles.  Tr. at 610.  Herring took the wheel of the van and radioed Patriot's dispatcher to inform him that the final pickup was about to be made.  Tr. at 612.  When the pair arrived at

Tanger, they both exited the vehicle and loaded the van with approximately 81 bags of cash. Tr. at 613-15. The pair returned to the van and Herring drove them to the Suffolk County National Bank to deposit the Tanger money. Tr. at 616.

**B.    The Robbery**

At around 11:30 p.m., the van entered the bank's parking lot and stopped approximately 40 feet away from the night deposit box. Tr. at 617-19. Micieli exited the van while Herring remained behind the wheel to fill out paperwork. Tr. at 620. Micieli opened the van's sliding door to begin the deposit, but then needed to urinate. Tr. at 621. Micieli found a discrete place, away from the bank's security cameras, but as he approached the spot he perceived an odor, "like somebody was sweating." Tr. at 621-22. He drew a weapon from his belt and slowly returned to the truck. Tr. at 622.

Three men appeared and fired three shots into the air. Tr. at 624-25. Micieli was shot in the chest and returned fire, striking two of the assailants in the leg. Tr. at 625-29. He described the assailants as tall, medium and short with dreadlocks. Tr. at 628-29. Micieli shot the tall one in the chest and the medium one in the leg. Tr. at 633. Herring left the driver's seat and moved behind Micieli on the far side of the van. Tr. at 624, 635. As Micieli prepared to fire his fourth shot, Herring ran in front of him and Micieli shot him in the right shoulder. Tr. at 636-37. Herring ran back to the bank's night deposit window and was fatally shot by the assailants. Tr. At 637. He died in the fetal position, approximately 10 feet from the window. *Id.* Out of ammunition, Micieli crawled under the van. Tr. at 638. The tall gunman approached the vehicle. Tr. at 639. He kicked Micieli in the back and fired two more shots under the van. Tr. at 643-44. Micieli was shot a sixth time when he raised his right arm to defend himself. Tr. at 643.

The gunmen then turned their attention to the open armored carrier. Tr. at 651-52. Micieli heard cash bags being dragged out of the truck and into a nearby car. Tr. at 652. When he heard the assailants drive away, Micieli closed the open doors of the van and crawled into the driver's seat. Tr. at 652-53. Micieli reported the ambush to his son who was the dispatcher and then drove the van to a nearby gas station for help. Tr. at 653.

C.     **Petitioner and Starks Are Wounded**

Within an hour of the robbery, Carmel Kelly, Leftenant's estranged girlfriend, arrived at her summer home in Rocky Point, New York. Tr. at 1057. Before settling into bed, she was startled by a noise at her door. Tr. at 1058-59. Kelly saw no other cars in her driveway and no one responded when she called out. *Id.* She suspected that her home was being burglarized and called the police. *Id.* While on the phone, she called out a second time. This time, Leftenant identified himself. Tr. at 1062. Kelly canceled the police and walked onto her front porch. *Id.*

Kelly found Leftenant lying on the porch with a gunshot wound to his leg. Tr. at 1064. She helped him into her living room and laid him out on the floor. Tr. at 1064. She helped Leftenant remove a dark pair of warm-up pants and a dark sweatshirt. Tr. at 1066. Leftenant told Kelly that his car had run out of gas down the road and that he had crawled the remaining distance. Tr. at 1067-69.

Jamal Starks remained in the car, a cranberry red Lexis, until Kelly arrived. Tr. at 1068. He was also shot and semi-conscious. Tr. at 1069. After rousing him, she maneuvered her car behind the Lexis and pushed it back to her home. Tr. at 1069-70. Kelly dragged Starks into the living room and laid him near Leftenant. Tr. at 1071. She stripped Starks down and noticed that he had also been shot in the leg. Tr. at 1072. Kelly demanded that they go to hospital and

Leftenant and Starks complied. Tr. at 1073.

Kelly propped Starks in the front seat of her car and arranged Leftenant across the back. Tr. at 1073. Kelly drove the car in the direction of the two nearby hospitals in Port Jefferson. Tr. at 1075. Leftenant told Kelly he wanted to avoid local hospitals and instructed her to get on the Long Island Expressway instead. Tr. at 1075. Kelly drove through Suffolk and Nassau counties, as per Leftenant's instructions, eventually ending up at Jamaica Hospital in Queens County. Tr. at 1078. Starks and Leftenant entered the emergency room in their underwear without Kelly. Tr. at 1078. Leftenant gave a false name to the hospital and claimed he was a victim of a robbery. Tr. at 1082-84.

Later that day, Kelly received a call from a Carl Watkins at the Jamaica Hospital Emergency Room. She did not converse with him, but recognized Mr. Leftenant's voice on the other end. Tr. at 1082-83. Kelly then drove Leftenant's Lexus to the hospital and found him listed as a patient under the name Carl Watkins.[2] Tr. at 1086. The Lexus was co-owned by Leftenant and his sister and was later found stored in his sister's garage without plates. Tr. at 1261-1262. Leftenant reacted angrily when he found out that the Lexus had been brought to the hospital and demanded that she bring it back to Rocky Point. Tr. at 1087. Blood matching Leftenant's DNA was found in the car. Tr. at 1518-1520.

Kelly returned to the hospital on the following Sunday. Tr. at 1088. Leftenant asked her to pick up his cousin, Blie, from his home in Freeport and take him to Rocky Point to "pick up the Lexus." Tr. at 1089. The next time Kelly saw Leftenant was at his parent's home in Freeport a few days later. Tr. at 1094. She drove him to a shoe store for a pair of slippers and later to the

---

[2]Subsequent testimony use the names "Watkins" and "Watson" interchangeably.

Lynbrook branch of the Jamaica Savings Bank where Leftenant opened a safe-deposit account. Tr. at 1095. Leftenant made a deposit in the box, possibly from a duffel bag that he had carried into the bank. Tr. at 835, 1098.

A few weeks later, Kelly bumped into Leftenant near Freeport's restaurant district. Tr. at 1104. Leftenant told her that his leg was feeling better and the he planned to spend the approaching holidays with his family in North Charleston, South Carolina. *Id.*

**D.      Automobile Purchases**

On October 2, 1997, ten days after the robbery, Barbara Brown, Blie's mother-in-law, purchased a 1994 Chevrolet Cavalier with $2,100 cash. Tr. at 587-88. That same day, Shavetta Blie, Blie's wife, traded in a 1995 Nissan Sentra for a 1997 Nissan Pathfinder. Tr. at 1220. Mrs. Blie paid $10,021 of the balance in cash and financed the remaining $22,353. Tr. at 1147-49. On October 6, 1997, Blie purchased a 1993 Toyota Land Cruiser with $26,346, cash. Tr. at 850-52. On October 28, 1997, Leftenant purchased a 1993 Mercedes S Class 300 SE with $32,000 cash. Tr. at 842.

**E.      Blie is Arrested**

On January 16, 1998, Blie was arrested for the robbery and homicide. Tr. at 1256. Acting on the information from Blie, Detective Douglas Mercer of the Suffolk County Homicide Squad returned to Freeport to speak to Leftenant's sister and father. Tr. at 1259. The police had learned that Leftenant was now located in North Charleston, South Carolina and contacted local authorities in the area. Tr. at 1259.

On January 18, 1998, Riverhead Town Judge Harry Saxtein issued a warrant for Leftenant's arrest for the murder of Patriot employee Andre Herring. *See* Warrant No. 142-88.

The North Charleston Police peacefully apprehended Leftenant on the same day. Tr. at 884. When the police officers approached him, Leftenant raised his hands and said, "I surrender. I give. I'm not armed." Tr. at 884, 913. While the North Charleston Police detained him he was neither questioned nor threatened. Tr. at 887. Leftenant waived his right to an extradition hearing and returned to New York. *See* Waiver of Extradition dated 1/19/98; Tr. at 1272, 1298.

### F. Petitioner Admits Involvement

Leftenant was transferred to the custody of Detective Mercer on January 19, 1998. Tr. at 1272, 1298. Mercer, along with his partner, Detective Anthony Laghezza, read Leftenant his *Miranda* rights. Tr. at 1276. Detective Mercer testified that Leftenant did not ask for an attorney during the subsequent interview but instead warned "If you put pen to paper, I will stop talking." Tr. at 1280-81. Laghezza put his pen and paper away, but subsequently wrote down his recollection of the interview. Tr. at 1281–82, 1295. Mercer confronted Leftenant with Blie's written statement and Leftenant began to talk about the crime. Tr. at 1283.[3]

Mercer testified that Leftenant admitted his participation in the robbery but denied involvement in the murder, claiming that Blie was responsible. Tr. at 1292-94. Leftenant told Mercer that Starks was also involved in the robbery. Tr. at 1293. Leftenant said that a majority of his money came from drug dealers and only a small amount came from the robbery. *Id.* Leftenant then stopped talking because "he had to have something to bargain with." Tr. at 1293.

### PROCEDURAL HISTORY

### A. Petitioner's Indictment

---

[3]Leftenant's statements to Detective Laghezza were the subject of a *Huntley* hearing at which the Judge found that the admissions of the defendant were made voluntarily and given after *Miranda* warnings and after Leftenant had waived his right to remain silent. Tr. at 1289.

In January 1998, Leftenant was indicted for two counts of murder in the second degree (New York Penal Law § 125.25[1][3]), attempted murder in the second degree (New York Penal Law § 125.25[1] modified Penal Law § 110), and one count of robbery in the first degree (New York Penal Law § 160.15). *See* Resp. Mem. at 1.

## B.      Motion to Suppress Incriminating Statements

Prior to trial, Leftenant's counsel filed several motions on his behalf, which included requests for *Dunaway, Wade, Mapp, Sandoval, and Huntley* hearings. On October 26, 1998, the state court judge conducted the *Huntley/Dunaway* hearing. In his decision dated August 23, 1999, Judge Klein found that Leftenant had been properly read his *Miranda* rights and further found "no improprieties whatsoever warranting suppression of any of [the Petitioner's] statements." Order dated August 31, 1999 at 2. The court also found sufficient probable cause and no constitutional violation connected with his extradition. *Id.* In August 1999, counsel moved by order show cause seeking reargument of the court's decision which had denied his motion to suppress ceratin statements made by him. By order dated September 9, 1999, the court denied the motion for reargument finding that there was no merit to his arguments contesting his arrest, no *Payton* violation, and no merit to his claims of ineffective assistance of counsel.

## C.      Trial and Sentence

The prosecution called 29 witnesses, ranging from the detectives who investigated the crime to Leftenant's former girlfriend. The prosecution also called several forensics witnesses. The prosecution's key witness, Joseph Micieli, the surviving guard and sole witness to the crime, testified for two days. He stated, among other things, that Leftenant matched the general build of the medium assailant. Tr. at 645-49. Although Micieli was unable to positively identify

Leftenant, he noted that the assailants had dread locks.  Tr. at 645-49.

After the first day of direct, a Newsday reporter spoke with prosecuting attorney, ADA Peter Timmons.  Tr. at 671.  Timmons provided some background information to the reporter and an article appeared in the paper the following day.  Tr. at 672.  The article contained no direct quotes from Timmons and instead focused on Micieli's inability to identify Leftenant under direct examination.  *See* Zachary Dowdy, *Surviving Guard Testifies About Bloody Heist,* Newsday, October 28, 1999.

In response to the article, Leftenant's attorney moved for a mistrial.  Tr. at 668.  Judge Mullen denied the motion and assembled the jury.  After explaining to the jury that an article about the case had been published, the Judge asked if any member of the jury had read the article.  Tr. at 673.  None of the members answered in the affirmative.  Judge Mullen reminded the jury of their oath and admonished them to avoid reading the article until conclusion of the trial.  After discussing the implications of the article on Leftenant's right to a fair trial, Mullen said, "where we have a conflict between a free press and a defendant's right, I'm going to line up with a defendant's right every single time."  Tr. at 674-75.

The prosecutor's closing remarks also prompted several objections from Leftenant's attorney.  Tr. at 2064-116.  Leftenant's attorney repeatedly argued that the Assistant District Attorney was misrepresenting the evidence in the record, however these objections were overruled.  Tr. at 2064-116.  On November 10, 1999, the jury convicted Leftenant on all of the counts.  He was sentenced to two concurrent indeterminate terms of twenty-five years to life for each of the second degree murder counts, and to a determinate terms of twenty-five years as a second felony offender for the attempted murder and first degree robbery counts to run

concurrent with each other, but consecutive to the murder counts.  *See* December 8, 1999

Minutes of Sentencing at 33-34; December 14, 1999 Minutes of Sentencing at 3.

**D.**     **Direct Appeal**

Leftenant appealed his conviction to the Appellate Division, Second Department.  In his

brief, Leftenant asserted all of the claims that he now raises in his habeas petition with the

exception of his argument concerning his attorney's failure to challenge his extradition.  *See*

*supra* at 15.  He also raised four additional claims in his direct appeal.  On October 11, 2005, the

Appellate Division affirmed his conviction, but reduced his sentence so that the conviction for

murder would run concurrently with the conviction for robbery in the first degree.  *See People v.*

*Leftenant,* 22 A.D.3d 603, 604 (2d Dep't 2005).

Specifically, the Appellate Division found that Leftenant's right to confrontation had not

been violated "inasmuch as the evidence [that a non-testifying witness had made a statement to

the police] was admitted not for the truth of the statement, but to show the detective's state of

mind and to demonstrate how the police investigation evolved." *Id.* at 605.  With respect to his

claim that his statements to police should not have been admitted, the Appellate Division found

that "his inculpatory statements to police made during their interview with him after his arrest

were made with intelligent, knowing, and voluntary waiver of his *Miranda* rights . . . were not

the product of coercion . . . [and] later statements to police were not in response to an inquiry,

and the defendant was not provoked, encouraged or induced to speak.  These statements were

spontaneous and not the product of interrogation and, as such, were admissible." *Id.*  Finally, the

Appellate Division denied Leftenant's ineffective assistance of counsel claim without comment

and found the defendant's remaining contentions, including those raised in his supplemental *pro*

*se* brief, either unpreserved for appellate review or without merit." *Id.*

Leftenant then sought leave to appeal from the Court of Appeals. His application was denied on December 27, 2005. *People v. Leftenant,* 6 N.Y.3d 755 (2005).

**E.    Section 440.10 Motion**

On March 6, 2007, Leftenant filed a post-conviction motion to vacate the judgment pursuant to N.Y.C.P.L. § 440.10. The motion reasserted the ineffective assistance of counsel claim, asserted that his fourth amendment rights were violated, and asserted that new evidence existed which would show that the search was illegal. With respect to the ineffective assistance of counsel claim, Leftenant argued that pretrial counsel had failed to subpoena the phone log of the North Charleston police, the police dispatcher, and his family to show that he had not voluntarily surrendered. On May 10, 2007, Judge Mullen denied the motion on the grounds that the ineffective counsel and fourth amendment claims had already been addressed and that Leftenant had not met the burden necessary to establish a review of new evidence. *See* Order dated May 10, 2007. Leftenant appealed the decision and the Appellate Division, Second Department denied the appeal. *People v. Leftenant,* Slip Op. No. 75682 (2d Dep't, Aug.13, 2007).

**F.    The Habeas Petition**

Leftenant filed his federal petition for a writ of habeas corpus on August 29, 2007. The respondent filed his opposition on November 16, 2007. *See* Return and Resp. Mem. of Law. Leftenant filed a reply on December 17, 2007. *See* Pet.'s Reply.

## DISCUSSION

### A. Standards

#### 1. Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 created a one year statute of limitations on an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. 28 U.S.C. § 2244(d)(1). This limitation period begins to run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(a). In a case where a direct appeal is taken, the statute of limitations period begins to run once the United States Supreme Court denies *certiorari*, or if *certiorari* is not sought, when the time to seek *certiorari* expires. *Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001). "Excluded from the one-year limitations period is "the time during which a properly filed application for State post-conviction or other collateral review . . . is pending." *Fernandez v. Artuz,* 402 F.3d 111, 112 (2d Cir. 2005).

In this case, Leftenant's conviction was affirmed by the Appellate Division, Second Department, on October 11, 2005, and the Court of Appeals denied leave to appeal on December 27, 2005. His conviction became final ninety days thereafter, or March 27, 2006. "Absent a 'properly filed' state application for collateral review," the statute of limitations expired on March 27, 2007. Leftenant filed his habeas petition on August 29, 2007. Accordingly, one hundred and fifty-five days of tolling was required to withstand the statute of limitations. *See id.* Leftenant filed his section 440.10 motion on March 6, 2007, and it was denied by the Second Department on August 13, 2007. Since the motion was filed on or before March 11, 2007 (155 days before the denial), the petition appears to be timely.

13

## 2.        Exhaustion

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), before bringing a petition for habeas corpus relief in federal court, a petitioner must "exhaust the remedies available in state court or demonstrate that 'there is an absence of available [s]tate corrective process [or that] circumstance exist that render such process ineffective to protect the rights of the [petitioner]." *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 808 (2d Cir. 2000)(citing 28 U.S.C. § 2254(b)(1)). To satisfy the exhaustion doctrine, a habeas corpus petitioner must "fairly present" his federal claim to the highest state court. *Baldwin v. Reese,* 541 U.S. 27, 32 (2004). A claim is "fairly presented" if the state courts are informed of "both the factual and the legal premises of the claim [asserted] in federal court." *Jones v. Vacco,* 126 F.3d 408, 413 (2d Cir. 1997)(quoting *Daye v. Attorney Gen.,* 696 F.2d 186, 191 (2d Cir. 1982)).[4]

In his appellate brief, Leftenant argued (1) that his right to confrontation was violated; (2) that he was denied the effective assistance of counsel; and (3) that he did not receive a fair trial. The Appellate Division found:

> (1) that Leftenant's claim "that his constitutional right to confront witnesses was violated when the trial court allowed the People to elicit evidence that a non-testifying codefendant made a statement to police is partially unperserved for appellate review [but] there

---

[4]A petitioner can be ensured that the state courts have been apprised of the constitutional nature of his claims by demonstrating

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) [an] assertion of a claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) [an] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Ojeda v. Fischer,* Report and Recommendation, 06 CV 3368 at 12 (Freeman, MJ), adopted 2009 U.S. Dist. LEXIS 68337 (citing *Daye,* 696 F.2d at 194).

was no violation . . . inasmuch as the evidence was admitted not
for the truth of the statement, but to show the detective's state of
mind;"

(2) the defendant received the effective assistance of counsel;

(3) the defendant's remaining contentions [including the claim that
he did not receive a fair trial because of the prosecutor's improper
statements to the jury during summation and to the press during
trial] are either unpreserved for appellate review or without merit.

*People v. Leftenant,* 22 AD3d 603, 605 (2d Dep't 2005). Accordingly, these claims have been

fully exhausted.

However, Leftenant did not raise his argument regarding his trial counsel's failure to

challenge his extradition before either the Appellate Division on his direct appeal or before the

trial court in a Section 440.10 motion. Accordingly, this claim is unexhausted. "When

presented with a 'mixed petition' containing both exhausted and unexhausted claims a federal

court . . . may deny the petition on the merits pursuant to § 2254(b)(2) notwithstanding the failure

of the petitioner to exhaust remedies." *Mingo v. Ercole,* 2010 U.S. Dist. LEXIS 126966 * 13

(E.D.N.Y Nov. 30, 2010). Here, Leftenant's claim regarding his extradition should be dismissed

on the merits for the reasons addressed below.

### 3.    Standard of Review

Under the AEDPA, even where a federal constitutional claim has been adjudicated on the

merits by the state court, this court must accord great deference to the state court's decision. *See*

28 U.S.C. § 2254(d). A habeas petition

shall not be granted with respect to any claim that was adjudicated on the merits in State
court proceeding unless the adjudication of the claim - (1) resulted in a decision that was
contrary to, or involved an unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or (2) resulted in a decision that
was based on an unreasonable determination of the facts in light of the evidence

15

presented in the state court proceeding.

28 U.S.C. § 2254(d). Further, a state court's factual findings are presumed correct and can only be overcome by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

A state court decision is contrary to clearly established federal law when the state court applies a rule that "contradicts the governing law" set forth in Supreme Court decisions, or when the state court is faced with a set of facts that is materially indistinguishable from a prior Supreme Court decision, the state court reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is based on an "unreasonable application of federal law" when the state correctly identifies the governing legal principle, but unreasonably applies the principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003). To be contrary to, or an unreasonable application of federal law, a state court decision must be more than just incorrect or erroneous; it must have been objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).

**B. Petitioner's Claims**

**1. Right to Confrontation**

Leftenant's first habeas claim alleges that his right to confrontation was violated. This claim is comprised of two separate allegations. Leftenant first contends that his rights were violated when "the people elicited police testimony that defendant became a suspect as a result of an out of court conversation with a co-defendant who was not a witness at trial." Leftenant also contends that his rights were violated when the detective was permitted to testify over a defense objection that Leftenant had "orally implicated himself after he was confronted with the

16

confession of the same co-defendant." Leftenant argues that the testimony should have been excluded under *Crawford v. Washington*, 541 U.S. 36 (2004).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him." "In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the admission of out-of-court 'testimonial' statements offered for the truth of the matter asserted violates the Sixth Amendment's Confrontation Clause when the defendant has had no opportunity for cross-examination, even if the statements satisfy the requirements of the hearsay rules." *United States v. Carter,* 2009 U.S. App. LEXIS 6184 * 9-10 (2d Cir. Mar. 25, 2009). In his brief, Leftenant lists the specific testimony elicited by the state that he contends involved the testimonial statement of the co-defendant, Blie, who was not subject to cross examination. The testimony Leftenant refers to is as follows:

> Q. And was Blie placed within an interview room?
> A. Yes, he was.
> Q. Do you and other detectives have conversations with Mr. Blie?
> A. Myself and Detective Laghezza had conversations with Mr. Blie.
>
>        \*     \*     \*
>
> Q. Did there come a point in time that a statement was taken from Mr. Blie?
> MR. O'BRIEN: I object, your Honor.
> THE COURT: Sustained.
> MR. O'BRIEN: It's not relevant at this point.
> THE COURT: Well, I sustained it.
> Q. Now, Detective, after your conversation with Mr. Blie, did you respond to any location?
>
>        \*     \*     \*
>
> A. Um, I advised my partner, Detective Laghezza, to call North Charleston, South Carolina Police Department to have them go

look for a 1990 Mercedes Benz.

MR. O'BRIEN: I want a foundation as to when this was that he did notify Officer Laghezza.

THE COURT: Okay, why don't you inquire as to that.

MR. TIMMONS: We will do it, Judge …

Q. Detective, I'm sorry, what was the purpose of contacting North Charleston?

A. To see if Jeffus Leftenant's Mercedez Benz was in South Carolina.

Q. This was something you had information about?

A. That, correct.

\*       \*       \*

Q. This occurred after Richard Blie had been arrested the previous day?

A. That's correct.

Q. Now, did there come a point in time that you and other detectives actually ended up in Freeport that night?

A. Yes, we did.

\*       \*       \*

Q. What was the purpose of going to Freeport?

A. To speak to Jeffus' sister, Zena Leftenant.

Q. Why was it you were seeking to speak to Zena Leftenant?

A. Zena owned the Lexus that had been - she owned the Lexus we were aware of that might have been used in the robbery.

Q. Objection, your honor.

THE COURT: What grounds?

MR. O'BRIEN: Hearsay.

THE COURT: I'll sustain that and direct the jury to disregard it.

(Tr. at 1258-61)

\*       \*       \*

Q. Now, do you recall after [Leftenant] said that initially about "If you put pen to paper, I will stop talking," what, if anything, else did he say or what were some of the things he said?

A. After that occurred I told him we wanted to talk to him about the armored car robbery. I wanted to tell him what we had on the case, I wanted to show him paperwork. After that we started talking about the armored car robbery.

Q. Before he actually made any comments to you, you actually did more talking to him?

A. That's correct.
Q. You said you showed him something?
A. Yes, we did.
Q. Did you show him a particular document?
A. I showed him a statement from Richard Blie.
MR. O'BRIEN: Objection, your Honor. I asked for a mistrial. This is unfair, your Honor. (Tr. at 1283).

THE COURT: Now, the second part of your argument which is in support of your application by Mr. O'Brien is that the reference to a statement by a codefendant is prejudicial and, therefore, would be a basis to grant a motion for a mistrial. . . . In my judgment that doesn't constitute a violation of Burton. A reference to a statement, because a jury doesn't know what is in the statement and that is what Burton is so careful to guard against, because we don't want anything that a codefendant said against Mr. Leftenant because anything that approached that clearly, would be, would not only be inadmissable, but prejudicial. The mere reference to it is the issue of whether that constitutes a violation of Burton. I don't believe it does. (Tr. at 1289-90).

The Detective's statements referencing having had conversations with Blie and the actions he took in response to those conversations and his statement regarding having shown Leftenant a statement from Blie do not constitute testimonial statements covered by *Crawford.* Although the Supreme Court did not expressly define "testimonial" in *Crawford,* the Court stated that "the [Confrontation] Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. 59, n. 9. While *Crawford* would have covered, for example, testimony that Blie "said X" to the Detective, there is no legal support for the conclusion urged by Leftenant that the Detective's testimony, which may have caused the jury to infer that Blie "said X, but which did not itself quote or paraphrase" Blie's statement, would also be covered by *Crawford*. *See United States v. Maher,* 454 F.3d 13 (1ˢᵗ Cir. 2006). Accordingly, *Crawford* poses no bar to the admission of those statements and this court has no basis to find that the Appellate Division acted contrary to or unreasonably applied federal

law in rejecting this argument.[5]

## 2. Ineffective Assistance of Counsel

In his second habeas claim, Leftenant alleges that his right to the effective assistance of counsel was violated. In particular, Leftenant alleges that his trial counsel failed to procure telephone records from the North Charleston police department, which would have demonstrated that he had not voluntarily surrendered to the police. Leftenant also claims that he received ineffective assistance of counsel because his trial counsel failed to contact his family members who would have confirmed that they had not called the North Charleston police to say that he wanted to surrender. Finally, Leftenant alleges that his trial counsel was ineffective because he failed to successfully suppress his confession and to challenge his extradition.

"[A] federal habeas court may not reach the merits [of a petitioner's] claims if the state court's rejection of a federal claim 'rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Carrion v. Smith,* 549 F.3d 583, 587 (2d Cir. 2008)(quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991). This rule applies where a petitioner's claims were defaulted in state court pursuant to a state procedural rule.[6] *See Coleman,* 501 U.S. at 750. "To determine whether the state law ground is 'truly an independent basis for [the] decision or merely a passing reference, such reliance on state law must be clear

---

[5]In any event, the inclusion of inclusion of the statements was harmless given the strength of the other evidence supporting Leftenant's conviction. *See United States v. Becker,* 502 F.3d 122, 130 (2d Cir. 2007)(Confrontation Clause violations reviewed under harmless error standard). An error is considered harmless unless it had a substantial and injurious effect on the jury's determination. *See Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993). There was ample evidence to convict Leftenant without the statements.

[6]An exception lies if the petitioner can show cause for the default and actual prejudice as a result of the alleged violation of federal law or that failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750.

from the face of the opinion.'" *See Cruz v. Smith,* Report and Recommendation, 05 CV 10703 (Freeman, MJ), 2009 U.S. Dist LEXIS 125096 *42-43 (S.D.N.Y. Sept. 25, 2009), adopted 2010 U.S. Dist. LEXIS 13831 (S.D.N.Y. Feb. 16, 2010)(citing *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 809 (2d Cir. 2009). To determine whether the state law ground was adequate to support the judgment, "the state procedural rule on which the court's decision was based must be a rule that is 'firmly established and regularly followed,' and that has not been 'misapplied in [the petitioner's] case.'" *See Cruz*, 2009 U.S. Dist LEXIS at 43 (citing *Ford v. Georgia,* 498 U.S. 411 (1991) and *Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir. 2003)). "[T]he preclusion of federal review applies only when 'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Carrion v. Smith,* 549 F.3d 583, 587 (2d Cir. 2008)(quoting *Glenn v. Bartlett,* 98 F.3d 721, 724 (1996).

In his appeal, Leftenant argued that he was denied the effective assistance of counsel when trial counsel failed to request a *Payton* hearing to challenge the admission of his confession. Leftenant also alleges that his trial counsel was ineffective because he failed to successfully suppress his confession by not arguing that he did not voluntarily surrender to police. The Appellate Division found that Leftenant had received the effective assistance of counsel. Leftenant then obtained telephone records from the North Charleston police department and based on those records filed his Section 440.10 motion arguing that his counsel had failed to obtain telephone records and contact family members.

Justice Mullen denied the motion holding that:

> Defendant previously raised the issue of ineffective assistance of
> pre-trial counsel on his appeal and it was rejected (see *People v.*
> *Leftenant,* supra). CPL 440.10(2)(a) specifically states that a
> motion to vacate must be denied when, "[t]he ground or issue

21

> raised upon the motion was previously determined on the merits
> upon appeal from judgment . . . "
>
> Additionally, CPL 440.10(2)(c) and 3(c) bar a defendant from
> raising in a 440 motion what should have been raised or was
> previously raised on appeal.

The court also noted that Leftenant had not presented any sworn allegations from the alleged witnesses to support his claim his claim that he had been illegally seized.[7]

By expressly stating that Leftenant was barred from raising the issues concerning ineffective assistance of counsel, namely, that his counsel had failed to subpoena phone records, to interview the North Charleston police dispatcher, or to interview his family members, the state court made it clear that it was relying on state procedural law as a ground for rejecting his claim. In addition, the state procedural rules at issue, those being Section 440.10(2)(a), (2)(c) and 3(c), are firmly established in New York state law and regularly followed. *See e.g. Clark v. Perez,* 510 F.3d 382, 393 (2d Cir. 2008). Thus, the state court's rejection of Leftenant's ineffective assistance of counsel claim rested on an independent state ground and was adequate to support the judgment.

Nonetheless, Leftenant could overcome the procedural bar by demonstrating "cause and prejudice for the default, . . . or that failure to consider the defaulted claim will result in a fundamental miscarriage of justice." *Cruz*, 2009 U.S. Dist LEXIS at * 46 (citing *Gray v. Netherland,* 518 U.S. 152 (1996) and *Coleman,* 501 U.S. at 750). The existence of "cause" for a procedural default turns on whether "(1)'the factual or legal basis for the claim was not

---

[7]The fact that Justice Mullen also noted that Leftenant had not presented any sworn allegations from the alleged witnesses to support his claim does not alter the fact that his claim was procedurally barred. *See Harris v. Reed,* 489 U.S. 255, 264, n.10 (1989).

reasonably available to counsel,'(2) 'some interference by state officials made compliance [with the procedural rule] impracticable,' or (3) "the procedural default is the result of ineffective assistance of counsel.'" *Cruz*, 2009 U.S. Dist LEXIS at * 46 (citing *Bossett v. Walker,* 41 F.3d 825, 829 (2d Cir. 1994)). Leftenant does argue that trial counsel was ineffective for failing to investigate his repeated claim that his confession was "obtained by exploitation of an illegal arrest" because he had not voluntarily surrendered to police and to challenge his extradition. But the demonstration of cause alone is insufficient.

A court may only excuse a procedural default where the petitioner also demonstrates prejudice, meaning that "the alleged constitutional error worked to the [p]etitioner's 'actual and substantial disadvantage,' or the petitioner demonstrates 'a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice.'" *Cruz*, 2009 U.S. Dist LEXIS at * 47-8 (citing *United States v. Frady,* 456 U.S. 152, 170 (1982) and *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000)). To meet the later standard a petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Cruz*, 2009 U.S. Dist LEXIS at * 48 (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Here, the petitioner has not asserted a claim of actual innocence as a means of overcoming the procedural bar; rather, he argues that he was prejudiced by his counsel's failure to procure telephone records which would have, he argues, establish that he did not voluntarily surrender and therefore prohibit the use of his oral statements.

"In order for counsel to be deemed constitutionally 'ineffective', however, counsel's conduct must have 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Ojeda v. Fischer,* Report and

Recommendation, 06 CV 3368 (Freeman, MJ), adopted 2009 U.S. Dist. LEXIS 68337 (citing *Strickland v. Washington*, 466 U.S. 668, 686). "Thus, to prevail on [his] ineffective assistance of counsel claim, [Leftenant] must show: (1) that counsel's performance 'fell below an objective standard of reasonableness' and (2) that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Ojeda* at 21 (citing *Strickland*, 466 U.S. at 688, 694). Moreover, the court need not address both prongs of *Strickland* if the petitioner fails to make a sufficient showing on one. *Strickland*, 466 U.S. at 486.

In this case, there is no reason to believe that the outcome of the petitioner's case would have been different if his counsel had investigated his claims regarding his involuntarily surrender to the North Charleston police or to challenge his extradition. To begin with, Justice Mullen considered Leftenant's argument that his counsel's failure to obtain telephone records and contact family members would have shown that he had not voluntarily surrendered, and thus, changed the outcome of the suppression hearing. Justice Mullens noted that, like here, Leftenant did not present sworn statements from his alleged witnesses to support his claim. In fact, Leftenant did not even identify the alleged family members that he claimed should have been contacted, leaving the court guessing as to what might have been said at a pretrial hearing. Moreover, Leftenant's counsel had argued that he was illegally arrested and sought the suppression of his statements, but the trial court found that there was no constitutional violation given the fact that his statements were not the product of interrogation and that had been made after intelligently, knowingly and voluntarily waiving his Miranda rights. *See Strickland*, 466 U.S. at 689 (counsel's investigation regarding defenses need not be exhaustive as long as it

includes "independent examination of facts, circumstances, pleadings and laws involved"). Finally, Leftenant's eleventh-hour claim regarding his counsel's failure to challenge his extradition his entirely without merit given his voluntary waiver of an extradition hearing. As such, Leftenant has not demonstrated that he suffered any prejudice as a result of this trial counsel's conduct.

Finally, when considering claims of ineffective assistance of counsel, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Colon,* 2010 U.S. App. LEXIS 24735 *4 (2d Cir. Dec. 3, 2010 (citing *United States v. Gaskin,* 364 F.3d 438, 468 (2003)(quoting *Strickland*, 466 U.S. at 689)). Leftenant's counsel made numerous motions on his client's behalf, moved for dismissal of the indictment for legal insufficiency, sought to sever the petitioner's trial from the co-defendants' trial, advocated that his client was illegally arrested and vigorously cross-examined numerous witnesses at the pretrial hearings and throughout the trial. Taking the record as a whole, Leftenant has offered no evidence to overcome this "strong presumption." Accordingly, Leftenant's ineffective assistance of counsel claim fails under *Strickland* and, even apart from the fact that it is procedurally barred, the ineffective assistance of counsel claim should be rejected as meritless.

### 3. Right to Fair Trial

Leftenant argues, in his third habeas claim, that he was denied his constitutional right to a fair trial because the prosecutor was permitted to make statements during summation which mischaracterized and denigrated the defense. Specifically, Leftenant contends that (1) the prosecutor suggested that his counsel had two irreconcilable versions of the evidence; (2) the

prosecutor shifted the burden of proof to him by highlighting the fact that he had not explained how he received a bullet wound at the robbery scene; (3) the prosecutor's statements to the press during the trial deprived him of an impartial jury; and (4) the court failed to question each juror individually *in camera* to determine if they had read the newspaper article.

### a. Procedural Bar

In his appeal, Leftenant argued that he was denied a fair trial. The Appellate Division found that his contentions, including his claim that he did not receive a fair trial because of the prosecutor's improper statements to the jury during summation and to the press during trial, were either unpreserved for appellate review or without merit. *People v. Leftenant,* 22 AD3d 603, 605 (2d Dep't 2005). "Because the Appellate Division did not explicitly rely on procedural default in denying these claims, they are not precluded from federal habeas review." *Daniels v. People,* 2009 U.S. Dist. LEXIS 74889 *29 (E.D.N.Y. Aug. 21, 2009)(relying on *Fama,* 235 F.3d at 810-811 ("when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review" because 'the state court has not adequately indicated that its judgment rests on a state procedural bar"). However, as discussed below, the claims are without merit.

### b. Merits

While prosecutorial misconduct can result in the reversal of a conviction, inappropriate comments alone would not justify a reversal in an otherwise fair proceeding. *See United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002). To warrant reversal, the misconduct must cause the defendant "substantial prejudice" by "'so infecting the trial with unfairness as to make the

resulting conviction a denial of due process.'" *Elias*, 285 F.3d at 190 (quoting *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999). The prosecutor's remarks during summation only amount to a denial of due process if they constitute "egregious misconduct," which is assessed by considering a three step test: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *Id.*

Leftenant first claims that the prosecutor mischaracterized and denigrated his defense by suggesting that his counsel had two irreconcilable versions of the evidence during summation. Specifically he points to the following statements:

> ADA TIMMONS: I understood the defense right from the get-go, right in the middle of his opening statement to be "I wasn't even there." That is what I heard in this courtroom. And now I have heard for the first time that, well, not for the first time, intimated from the opening and thereafter throughout the trial, maybe this wasn't just simply "I wasn't there." Maybe now it turned into, "Well, if I was there, it's something other than- - "
>
> MR. O"BRIEN: Objection
>
> THE COURT: On what ground?
>
> MR. O"BRIEN: On the grounds I never said anything. He wasn't there, not that he was there.
>
> THE COURT: No, I think Mr. Timmons is responding to your argument on counts 1 and 3.
>
> ADA TIMMONS: Um-hum.
>
> MR. O'BRIEN: I did that on a different basis.
>
> THE COURT: Well, the jury will be able to discern the difference.
>
> MR. O'BRIEN: I object, your Honor.
>
> THE COURT: Go ahead.

ADA TIMMONS: As I said, it is my understanding that this was not, he was never there at the Suffolk County National Bank on September 26th and 27. Right, as a matter of fact in the middle of my opening I heard something to the effect "I wasn't even there." Now, Mr. O'Brien said in the first 20 minutes, maybe a half hour of his summation here explaining to you about counts 1 and 3 - that this is intentional murder count and the attempted murder count - - and what he tries to suggest to you is that, well, even if I was there, I'm not the shooter. It was Richard Blie.

        \*            \*            \*

ADA TIMMONS: Mr. O'Brien had the audacity to stand there and tell you Micieli shot Andre Herring.

        \*            \*            \*

ADA TIMMONS: Now he stands there and accuses one of the victims of this. Are they suggesting to you that both of the victims somehow deserved this?

(Tr. at 2064-69). The petitioner argues that by focusing on his counsel's statements, which were intended to show that the police had not done a thorough investigation rather than suggest that Micieli perpetrated the crime, the prosecutor impugned his counsel's integrity.

Leftenant also argues that his counsel's integrity was impugned when the prosecutor argued in summation that:

ADA TIMMONS: Mr. O'Brien wants to talk about this Mercedes and argued ad infinitum who seized it, why it was seized. The bottom line is that is why I put up this document 136. It's a Notice of Seizure by the South Carolina Police Department for the Mercedes. So when the police were down there, there was another reason South Carolina was taking that. You are not permitted to know that. I'm not allowed to talk about that.

MR. O'BRIEN: Objection.

THE COURT: What grounds?

MR. O'BRIEN: There is no evidence except that the car as being

held for Suffolk County. That document Mr. Timmons is holding
up is in evidence. The forfeiture summons.

THE COURT: They are allowed to look at it. The jury can draw
whatever conclusion they wish. It's written in English.

ADA TIMMONS: There's a motion of forfeiture of this vehicle. I
can't go into the reason why this vehicle was not seized by Suffolk
County. I will tell you I can't talk about that fact here and he
shouldn't hide behind it either.

MR. O'BRIEN: I object to innuendo.

THE COURT: Overruled.

(Tr. 2075-76). In this regard, he argues that the prosecutor commented on evidence that had been

deemed inadmissable, namely, the fact that drugs were found in the South Carolina residence,

leaving it to the imagination of the jurors what the real reason for the seizure was.

Here, the prosecutor's summation was in response to a portion of Leftenant's counsel's

summation that referred to the fact that Micieli had a failing business and knew there was three

hundred thousand dollars on the van (Tr. at 2012). The government is "ordinarily permitted to

respond to arguments impugning the integrity of the case." *United State v. Bagaric,* 706 F.2d 42,

60 (2d Cir.), *cert. denied,* 464 U.S. 840 (1983). When defense counsel's summation is

considered, it is clear that the prosecutor's statements were not inappropriate, and thus, do not

constitute egregious misconduct. *See United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992)

(holding that "a prosecutor is not precluded from vigorous advocacy, or the use of colorful

adjectives, in summation").

Leftenant also argues that the prosecutor improperly shifted the burden of proof to him

when he said:

ADA TIMMONS: Did you notice during summation here, how

much time was spent on all the mountains, the avalanche, or circumstantial evidence that I will talk to you about right now. There wasn't five minutes on that summation talking about that.

ADA TIMMONS: Now, this is perhaps one of the biggest points here. This was not mentioned at all on his, the defense's summation. More than anything else the defendant was shot in the leg and there is no mistake here and it is very important. There are two people shot in the leg here. This isn't one person. Where have you heard in this courtroom any explanation other than the fact that he was up at the Suffolk County National Bank in the middle of this melee of shooting for how he received the bullet hole? There has been nothing presented to explain that.

MR. O'BRIEN: Objection.

*   *   *

ADA TIMMONS: Well, we know that is not true. We know that he was out by Rocky Point and that he crawled to Carmel Kelly's door. Yet, there is nothing on summation on any of this evidence. We are supposed to focus on the big, bad, powerful, evil cops.

(Tr. at 2071, 2078, 2088). Leftenant argues that the prosecutor not only shifted the burden of proof to him when he made the statement, but he also vouched for the truth regarding the shooting and credited the testimony of Ms. Kelly.

This argument also fails as it is well established that the government may argue that the jury need not believe uncorroborated defense theories as long as the prosecutor does not suggest that the defendant has a burden or an obligation to adduce evidence. *United States v. Bautista*, 23 F.3d 726, 733 (2d. Cir. 1994). When the challenged statements are considered in context, a reasonable jury would not have understood them as anything other than an argument that the jury need not believe the petitioner's uncorroborated theories.

Finally, the petitioner argues that the prosecutor's statement to the press during the trial deprived him of an impartial jury because a juror could have read the article. This argument also

fails in that Leftenant's counsel alerted the court to the article, the court questioned the jury in order to ascertain whether anyone had read the article, and despite the fact that no one saw it, the court reminded the jury of its admonishment not to read media accounts of the trial. Tr. at 668-75). In doing so, the court "acted within the scope of the considerable discretion granted to the state court judges to determine the appropriate means to satisfy the constitutional requirement to ensure an impartial jury." *Edmonson v. Artus,* 2006 U.S. Dist. LEXIS 98216 * 25 (E.D.N.Y. Nov. 29, 2006). Accordingly, the court also finds Leftenant's right to a fair trial claims to be without merit.

## RECOMMENDATION

For all of the foregoing reasons, I recommend that the petition for a writ of habeas corpus be dismissed in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253 (c)(1)(A) because the petitioner has not "made substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within 14 days from service of this Report. Failure to file objections within this period waives the right to appeal the District Court's Order. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. June 30, 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir. 1993); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir. 1992).

Dated:  Central Islip, New York
        January 6, 2011

                                        _____/s/_____
                                        Arlene R. Lindsay
                                        United States Magistrate Judge